1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT TINO ARMENDARIZ,          )     No. C 07-00264 JF (PR)
                                 )
          Petitioner,            )     ORDER DENYING PETITION FOR
                                 )     WRIT OF HABEAS CORPUS;
   vs.                           )     DENYING CERTIFICATE OF
                                 )     APPEALABILITY
                                 )
MIKE KNOWLES, Warden,            )
                                 )
          Respondent.            )
                                 )
_____)

       Petitioner, proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. By order dated July 9, 2009, the Court found that Petitioner had raised eight

cognizable claims for federal habeas relief, and it ordered Respondent to show cause why

the writ should not be granted.  Respondent filed an answer addressing the merits of the

petition, and Petitioner filed a traverse.  Having reviewed the papers and the underlying

record, the Court concludes that Petitioner is not entitled to federal habeas corpus relief

and will deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

       The following facts and procedural background are taken from the unpublished

1 | opinion of the California Court of Appeal:

2 | I.    *Events Preceding Soto's Death*

3 |       Chuck Ducote and Soto were friends and had at one time been
4 | coworkers. On a weekend in mid – August 2003, Ducote was moving his
    | family from Salinas to Soledad.[1] He obtained a truck for the move at a
5 | rental yard in Chualar, where Greg Watkins – an individual with whom
    | Ducote had worked – lived in a trailer. On Saturday, August 16, Soto,
6 | Watkins, and another friend of Ducote's helped with the move.

7 |       On Sunday, August 17, Soto and Watkins again showed up to help
    | Ducote complete the move. Ducote was unable to get anyone else to help;
8 | Watkins called his friend, [Petitioner], who appeared later in the morning.
    | [Petitioner] had not met Soto before that day. The move took all day on
9 | Sunday to complete. Ducote had planned to take Soto home that evening
    | (because Soto did not drive); at the last minute, however, Ducote realized
10 | that he needed to drive from Chualar back to Soledad. Soto made
    | arrangements to have [Petitioner] drive him home in the vehicle that
11 | [Petitioner] was driving.

12 |      Later Sunday evening at around 10:00 or 11:00, [Petitioner] and Soto
    | stopped by the north Salinas home of [Petitioner]'s friend, Ted Bagatelos.
13 | Bagatelos worked the night shift at Fresh Express with [Petitioner] and
    | William Michael Silva, who was present at Bagatelos's home when
14 | [Petitioner] and Soto arrived that evening. ([Petitioner] and Silva were
    | friends.) The four men drank beer and visited. Soto and Bagatelos arm
15 | wrestled, and Soto won. There were no arguments; everyone got along well.
    | [Petitioner] appeared to Bagatelos to be intoxicated; [Petitioner] was acting
16 | "silly" and "energetic."

17 |      After about an hour or two, [Petitioner], Silva, and Soto left together.
    | When the three men left, they made plans to drop off the vehicle [Petitioner]
18 | was driving at his girlfriend's house and then go to the Harmony Bar in
    | eastern Salinas. (Silva had gone to that bar with [Petitioner] on at least two
19 | previous occasions.)

20 |      Silva followed [Petitioner] and Soto to the home of [Petitioner]'s
    | girlfriend in south Salinas. [Petitioner] was not driving at all erratically.
21 | After dropping off the vehicle [Petitioner] was driving, Silva drove
    | [Petitioner] and Soto to the Harmony Bar in Silva's Ford Taurus, arriving
22 | around 11:30 p.m. to midnight. He parked the car in front of the bar.
    | [Petitioner] remained at the bar, and Silva and Soto went in the back to play
    | pool and drink beer.

23 |
24 |      [Petitioner]'s girlfriend, Charlotte Turner, came to the bar while
    | Silva and Soto were playing pool. Turner – according to her statement to the
25 | police some days later – had an argument with [Petitioner] because he had
    | not returned her vehicle when she had expected it. She left the bar by
26 | herself.

27 | _____

28 |      [1] All further date references in this discussion of facts are to 2003 unless otherwise
    | stated. [Original footnote renumbered.]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.    *The Homicide*

Silva provided the main testimony at trial concerning the events of early Monday morning, August 18. The prosecution presented no further evidence on that issue, other than (1) corroboration of some aspects of Silva's testimony from Watkins's statements to the police, and (2) certain contradictory statements made by [Petitioner] afterward (see part III, *post*).[2] We therefore describe below Silva's testimony concerning the homicide, followed by a brief discussion of what Watkins told the police.

A.    *Testimony of Silva*

[Petitioner], Silva, and Soto stayed at the Harmony Bar for approximately one hour; they left together shortly after last call. They went directly from the bar to Silva's car. Silva drove, Soto sat in the front passenger seat, and [Petitioner] sat in the back seat behind Soto.

Shortly after they left the bar, [Petitioner] said, "'I need to call my old lady.'" The victim then said, "'976 what?'" To Silva, this statement "referred to the pornographic sex phone calls that people make, have sex on [the] phone." Silva thought that Soto was making a joke, and he and Soto both laughed. [Petitioner] appeared to be angry at the victim's comment, and said, "'Are you talking shit about my old lady?'" [Petitioner] then reached his right arm forward and placed it around Soto's neck. The victim was unable to say anything, but tapped [Petitioner] on the upper arm "to let go." Silva, still driving, said to [Petitioner]: "'[W]hat the hell you doing? Let him go. Let him go.'" [Petitioner] continued to have his arm around Soto's neck for a period that Silva estimated to be two or three minutes, or possibly a little less time. Eventually, he let the victim go.

After the victim was able to catch his breath, he turned around in the car and told [Petitioner], "'[H]ow did we go from having a good time to this?'" [Petitioner] responded angrily, "'I don't like people talking shit about my old lady.'" Soto responded, "'I didn't mean it like that.'"

The car was quiet for a few seconds, and then Soto made a sound.[3] [Petitioner] said, "'[W]hat, you think it's funny?'" [Petitioner] then placed his right arm around the victim's neck as he had done previously. (One or two minutes elapsed between the first and second choking incidents.) Silva again told [Petitioner] to let Soto go. [Petitioner] said, "'I can't.' [¶] ... [¶] ... 'I can't let him go because of repercussions.'" He also stated, "'I have already put my hands on him.'" Soto again tapped [Petitioner] or tried to free himself. While [Petitioner] had his arm around Soto's neck, he asked the victim, "'[H]ow does it feel to know you are about to die?'" [Petitioner] continued to choke Soto for "[a]long time." Silva "believe[d] in [his] mind

---

[2] During its deliberations, the jury requested and obtained a "read back" of Silva's testimony. [Original footnote renumbered.]

[3] The record does not reflect what type of sound the victim made. On cross-examination, Silva agreed with defense counsel that it was a sound "sort of like a disgusted [sigh]." Silva testified that it was a sound "[l]ike I can't even believe this is happening." [Original footnote renumbered.]

it was like 15 to 20 minutes[,] it seemed."

While [Petitioner] still had his arm around Soto's neck, Silva concluded that the victim was dead, because it smelled as if he had urinated and defecated. [Petitioner] continued to hold his arm around the victim's neck after he had gone limp.

[Petitioner] then gave Silva directions on where to drive. Silva told [Petitioner] that he "didn't want anything to do with this." [Petitioner] responded, "'Keep your mouth shut and keep driving.'" When he said this, Silva heard a click that he believed to be a knife. Silva was frightened by this, and was afraid "that [he] was next."

[Petitioner] directed Silva to a location outside of Salinas where there were trucks, a warehouse, some pallets, and a trailer. [Petitioner] approached the trailer while Silva waited in the car. [Petitioner] returned to the car with another person named Greg. (Silva had never met the person before that evening, but later identified him from a photograph as being Watkins.) Watkins checked Soto's pulse and told [Petitioner] that the victim was "definitely dead."

[Petitioner] and Watkins were having a conversation away from the vehicle. As Silva got out of his car and approached [Petitioner], saying he needed to talk to him, [Petitioner] pulled out a knife and said, "'[Y]eah?'"[4] Silva felt threatened and was afraid that [Petitioner] was going to hurt him; he told [Petitioner], "'I just want to let you know that I would never tell on you.'"

[Petitioner] and Watkins both got in the back seat of Silva's vehicle; Watkins was behind Silva and [Petitioner] was behind the victim's body. They looked for a gas station and eventually – after going to approximately two stations that were closed – found one that was open. [Petitioner] pumped the gas, and Silva paid the cashier with money obtained from Watkins. [Petitioner] and Watkins gave Silva directions, and [Petitioner] directed him to exit at Fort Hunter Liggett. [Petitioner] then directed Silva to an unlit farmland area "out in the boondocks."

[Petitioner] and Watkins got the victim's body out of the car; Watkins carried the body's feet, and [Petitioner] carried the head area. Watkins tripped and fell along the way. They carried the body about 12 feet from the roadway, and placed it face up on the ground. Silva heard [Petitioner] tell Watkins that he wanted to set the body on fire, but Watkins objected. [Petitioner] checked the pockets in Soto's pants and removed a wallet from them. [Petitioner] kept the wallet.

Silva dropped Watkins back at his trailer. Silva then drove [Petitioner] to his grandmother's home. It was past dawn when Silva dropped [Petitioner] off. As [Petitioner] left, he told Silva, "'Keep your mouth shut or else.'"

B.   *Watkins's Statement to the Police*

---

[4]  At trial, Silva identified a knife recovered from a search of [Petitioner]'s bedroom as being the knife brandished by [Petitioner].  [Original footnote renumbered.]

At trial, Watkins claimed no recollection of either his participation in the dumping of the victim's body or of any statements to the police.[5] He admitted that he did not want to testify against his friend, [Petitioner], and that he didn't "want to remember anything." But Watkins was impeached with his prior inconsistent statements to the police following his arrest on Thursday evening, August 21. These statements corroborated Silva's testimony.

Although Watkins denied having any knowledge during initial questioning, after the police informed him that they had found the victim's body, Watkins stated that Soto "was a good kid." The police then resumed questioning, and Watkins stated (concerning the events of early Monday morning, August 18) that: [Petitioner] and Silva came to Watkins's home after midnight "with a dead guy in the car"; [Petitioner] asked him for money, and he gave [Petitioner] $10.00; [Petitioner] had told Watkins that, earlier that evening after leaving the Harmony Bar, there had been a confrontation between [Petitioner] and Soto concerning [Petitioner]'s girlfriend, and that Soto had badmouthed her; he got in the back seat behind the driver, with [Petitioner] sitting next to him; he got in the car because [Petitioner] asked him to go along; the car smelled of "shit from the dead body"; he didn't realize it was Soto's body until later when they dumped it; the three of them stopped at a couple of gas stations that were closed; they eventually found an open gas station, where [Petitioner] pumped the gas and Silva paid the cashier (with the $10.00 Watkins had previously given [Petitioner]); he helped [Petitioner] dump the victim's body by taking its feet; he and [Petitioner] dumped the body about 10 feet from the roadway; while carrying the body, Watkins fell down; and [Petitioner] told him that he had taken the victim's wallet when the two dumped the body.

III.    *Events After The Homicide*

The victim's mother, Gloria Soto, became worried when her son did not return home on Sunday evening, August 17, as it was uncharacteristic for him to stay out at night without calling home. Mrs. Soto did not hear from the victim on Monday, August 18, which was very unusual: it was her birthday, and her son had never forgotten it before. Mrs. Soto contacted Ducote, who told her that he had last seen Soto at the rental company in Chualar the prior evening. She filed a missing persons report with the police that Monday evening.

Ducote called Watkins and obtained Turner's telephone number; he left word for [Petitioner] to call him. When [Petitioner] and Ducote spoke on Monday, August 18, [Petitioner] said that he and the victim had gone to the Harmony Bar on the east side of Salinas on Sunday evening. He did not say that anyone other than the victim went with him to the bar. [Petitioner] said that he split up with Soto at the bar when [Petitioner] left with his girlfriend around 2:00 a.m.

[Petitioner] gave a similar story to the victim's mother when she telephoned [Petitioner] the next day. [Petitioner] told her that he and the

---

[5]  Watkins was convicted as an accessory to Soto's murder in other proceedings. [Original footnote renumbered.]

victim had gone to the Harmony Bar, that he last saw Soto at the bar at about 1:00 a.m. Monday, and that he had left the bar with his girlfriend.

[Petitioner] provided a different story to the police that same day (Tuesday, August 19). When contacted about Soto's disappearance, [Petitioner] told Officer Daniela de Baca that he, Soto, and Silva went to the Harmony Bar on Sunday evening after [Petitioner] and Soto had helped a friend, Chuck, move from Salinas to Soledad earlier that day. [Petitioner] said that his girlfriend, Turner, arrived at the bar, was angry with [Petitioner], and took the keys to her vehicle and left. [Petitioner] told Officer de Baca that afterward, he, Silva, and Soto stood in front of the bar. [Petitioner] told the group that he was going to return to his girlfriend's home in south Salinas, and Soto responded that he was heading in a different direction, to the east side of Salinas. [Petitioner] related to Officer de Baca that he and Silva then left, and that [Petitioner] last saw Soto in front of the bar.[6]

Silva cleaned the front passenger seat of his car on Tuesday or Wednesday, August 19 or 20, to remove the smell. [Petitioner] stopped by Silva's home multiple times in the days after Soto was killed. (Silva and [Petitioner] lived a short distance from each other.) On one occasion, [Petitioner] said that he had already spoken to the police, that he had given the police Silva's name, and that "they don't have anything as far as evidence." [Petitioner] told Silva to tell the police that he and [Petitioner] left the victim at the Harmony Bar, and that Soto had not left with them.

In response to a message left with Turner, [Petitioner] called Sergeant James Fry of the Salinas Police Department on Wednesday evening (August 20). (Sergeant Fry was the lead officer in the homicide investigation.) [Petitioner] said that he first met the victim (to whom he referred as "Ernie") on Sunday, August 17, when the two of them helped Ducote move from Salinas to Soledad. He told Sergeant Fry that he, Soto, and Silva had gone to the Harmony Bar on Sunday evening. [Petitioner] related that his girlfriend came to the bar, "caused a scene, wanting some car keys back to her vehicle." He gave her the keys and she left the bar without him. [Petitioner] stated that: he later left the bar with Silva and the victim; Silva's car was parked in front of Safeway (next to the bar);[7] the victim got out of the vehicle because he lived on the east side and did not want to go to the south side of town where [Petitioner]'s girlfriend lived; and [Petitioner] last saw the victim on the east side of the Safeway parking

---

[6] Similarly – according to Turner's statement to the police – [Petitioner] told her that when the three men had left the bar, Soto had said that, because he lived on the east side of town, he did not want to drive with Silva and [Petitioner] to south Salinas. [Petitioner] told Turner that, because of this, Silva and [Petitioner] "left Ernie Soto there by Safeway." [Original footnote renumbered.]

[7] Turner testified that Silva's vehicle was parked in front of the Harmony Bar when she went there Sunday evening. Sergeant Fry testified that the Safeway store was located approximately 100 feet from the Harmony Bar, and that there were two or three businesses between the bar and the store. [Original footnote renumbered.]

lot.[8]

On Wednesday evening (August 20), Silva contacted his parole officer, Anthony Kaestner, to tell him about Soto's death. He left a voice mail message telling Kaestner that he was fearful for his life.

Silva told Kaestner on Thursday, August 21, that he had witnessed the murder of Soto, stating that [Petitioner] had strangled Soto while the victim was in the front seat and [Petitioner] was in the back seat of Silva's car. Silva then gave a statement to Sergeant Fry. He surrendered his vehicle voluntarily to the police. That day, Silva took Sergeant Fry to the location where [Petitioner] and Watkins had dumped Soto's body. The victim's body was found near Fort Hunter Liggett, off of San Lucas Road near Jolon Road. It was face up, approximately seven feet from the shoulder of the roadway, next to a barbed wire fence; each of these three facts concerning the body's placement was consistent with Silva's previous statement to the police.

That evening, Silva cooperated with the police in making three pretext calls to [Petitioner]. During the third call, the following exchange took place: "[Silva]: [Y]ou need to tell me what you told the cops so I know what the fuck to tell 'em when they find me, dude.... [Y]ou know I just got out of prison. My PO already came lookin' ... at my house in Salinas. I need to know what's goin' on. And I'm not goin' to prison for you, dude, unless you tell me what the fuck you told 'em so I know what the fuck to say. Bobby? [¶] [[Petitioner]]: Huh. Hmmmm, where are you at? [¶] [Silva]: I'm, I'm out and about, dude. I'm not telling anyone where I'm at right now. You need to tell me, dude, or else if the cops find me, ... I'm gonna tell 'em, dude. I'm gonna tell 'em the truth. I didn't kill him, dude. You did. You know that. And I'm not gonna go down for your shit, dude. [¶] [[Petitioner]]: "What? You were driving when we dropped him right there on the side, dog."

On Friday. August 22, Dr. John Hain, a forensic pathologist, performed the autopsy of the victim. The autopsy revealed that there were two fractures of the cricoid cartilage (immediately below the Adam's apple), and a flattening (and possible partial fracture) of the thyroid cartilage. These injuries were antemortem (predeath); they could not have been inflicted on a young person such as the victim without "a lot of force." Although there was significant decomposition due to the body's exposure to the heat, Dr. Hain determined that the probable cause of death was strangulation, and that the injuries were consistent with death accomplished by a stranglehold from behind.

[Petitioner] was arrested by the Salinas Police Department that Friday, August 22.

PROCEDURAL BACKGROUND

---

[8] The distance between the Harmony Bar and the victim's home was 3.6 miles. Mrs. Soto testified that this distance was not the typical distance that her son would walk. [Original footnote renumbered.]

1

2           [Petitioner] was charged by amended information filed July 8, 2004,
        with two counts: (1) first degree murder (Pen. Code, § 187) of Ernest Soto;
3       and (2) dissuading a witness (William Silva) by force (Pen. Code, § 136.1,
        subd. (c)(1)). The information also alleged that [Petitioner]: personally used
4       a deadly weapon, a knife (Pen. Code, § 12022, subd. (b)(1)), in the
        commission of the offense charged in count 2; had two prior strike
5       convictions (Pen. Code, § 1170.12, subd .(c)(2)); and had two prior serious
        felony convictions (Pen. Code, § 667, subd. (a)(1)).[9]

6           After a jury trial, [Petitioner] was convicted on September 10, 2004,
        of both counts, i.e., first degree murder, and dissuading a witness by force,
7       and the deadly weapon allegation was found true. In the second phase of the
        bifurcated trial, the court found true the remaining allegations. [Petitioner]
8       filed a motion for new trial, which was denied. On November 12, 2004, the
        court imposed judgment of imprisonment of 111 years to life. [Petitioner]
9       filed a timely notice of appeal on November 16, 2004.

10   See People v. Armendariz, No. H028176, slip op. at 2-11 (Cal. Ct. App. Sept. 6, 2005)

11   (Resp't Ex. 6) (footnotes in original and renumbered).

12

13                              **DISCUSSION**

14   **A.    Standard of Review**

15       Because the instant petition was filed after April 24, 1996, it is governed by the

16   Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes

17   significant restrictions on the scope of federal habeas corpus proceedings.  Under

18   AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding

19   unless the state court's ruling was "contrary to, or an involved an unreasonable

20   application of, clearly established federal law, as determined by the Supreme Court of the

21   United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination

22   of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

23   2254(d)(2).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if

24   the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on

25   a question of law or if the state court decides a case differently than [the] Court has on

26   a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13

27   ───────────────

28       [9] All future statutory references are to the California Codes unless otherwise
        indicated.

1    (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant

2    the writ if the state court identifies the correct governing legal principle from [the] Court's

3    decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.

4    "[A] federal habeas court may not issue the writ simply because the court concludes in its

5    independent judgment that the relevant state-court decision applied clearly established

6    federal law erroneously or incorrectly.  Rather, that application must also be

7    unreasonable."  Id. at 411.

8          A federal habeas court making the "unreasonable application" inquiry should ask

9    whether the state court's application of clearly established federal law was "objectively

10   unreasonable."  Id. at 409.  The "objectively unreasonable" standard does not equate to

11   "clear error"  because "[t]hese two standards... are not the same.  The gloss of clear error

12   fails to give proper deference to state courts by conflating error (even clear error) with

13   unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

14         A federal habeas court may grant the writ if it concludes that the state court's

15   adjudication of the claim "resulted in a decision that was based on an unreasonable

16   determination of the facts in light of the evidence presented in the state court proceeding."

17   28 U.S.C. § 2254(d)(2).  The court must presume correct any determination of a factual

18   issue made by a state court unless petitioner rebuts the presumption of correctness by

19   clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

20   **B.    Analysis of Legal Claims**

21         Petitioner raises eight claims for federal habeas relief: (1) the trial court violated

22   due process by allowing the jury to hear prejudicial evidence of prior acts; (2) the trial

23   court violated Petitioner's right to present a defense by refusing to allow the jury to view

24   the vehicle in which the murder took place; (3) the exclusion of impeachment evidence,

25   namely an agreement between Silva and the police and Silva's participation in the witness

26   protection program, violated due process; (4) Petitioner was denied his right to effective

27   cross-examination of a prosecution witness; (5) the trial court unlawfully used a prior

28   conviction to enhance Petitioner's sentence; (6) the use of a non-serious crime to enhance

1   Petitioner's sentence under the California "Three Strikes Law"[10] violated the Ex Post

2   Facto clause; (7) Petitioner's trial counsel rendered ineffective assistance; and (8)

3   Petitioner's appellate counsel rendered ineffective assistance.

4   **1.   Prior Bad Act and Statement**

5        Petitioner's first claim attacks the admission in evidence of a prior act and

6   statement to support the murder charge.  The trial court allowed Petitioner's co-worker,

7   Theodore Bagatelos, to testify that he and Petitioner engaged in a friendly wrestling

8   match about a month before Soto's murder.  (Resp't Ex. 2, Reporter's Transcript ("RT")

9   at 588, 604.)  The match ended with Petitioner applying pressure with his arm around

10  Bagatelos's neck, which prompted Bagatelos to give up.  (Id. at 604.)  Bagatelos later told

11  Petitioner that the choking maneuver hurt.  (Id. at 605.)  Bagatelos, a large man at 6'1"

12  and 195 pounds, testified that Petitioner was very strong.  (Id.)  The trial court determined

13  that the facts of the prior incident should be limited to evidence establishing Petitioner's

14  strength, the absence of mistake, and his choice to attack the neck:

15           THE COURT: As the testimony as a whole. It is relevant.  Now, the
         question the court has to decide is the probative value of that evidence
16       versus the prejudicial effect.  I think the probative value of what you are
         trying to demonstrate to the court is the fact that the [Petitioner] does have
17       the strength to apply this type of force and that there is an absence of
         mistake and also that there is a choice to harm somebody by going for the
18       neck.

19           I believe then you would need to stick with those facts because that
         directly goes to something that is at issue in the case and probative value
20       outweighs prejudicial effect.  I believe any of the conversation in between
         with respect to the two of them, I believe in some respects is a little bit
21       prejudicial.  I think what you can do is get the fame facts out by saying did
         you have a wrestling match.  Did you get hurt? Or was there some harm?
22       Yes.  Was there a large amount of force?  Yes, there was.  When you
         notified the [Petitioner] that you were hurt, what was his response?

23           I believe that tailored in that fashion would get the same evidence in
24       going to an issue of fact without being prejudicial to the side.  I think the
         bantering back and forth between the two of them may lead the jury to
25       believe to some degree that, they don't conclude that but could be leading
         them to issues of character as opposed to specific facts.

26
27           But stick with the facts of how much force was applied.  Were you

28  [10]  Cal. Pen. Code § 667.

1   injured?  Yes.  Did you notify him of your injury?  Yes.  What was his
2   response.  And then those statements, I believe those statements go to the
    issue of identity if in fact a person is harmed by force on a neck, any prior
3   hurt somebody by force in the neck and that's his desired way of hurting
    people is through the neck, that is highly probative as to the issue of identity
4   in this case, and the probative value outweighs prejudicial effects.

5   (Id. at 597-98.)

6       Bagatelos also testified that Petitioner made the following statement six weeks

7   before Soto's murder: "[Petitioner] told me that when he fights, he likes to go for the neck

8   and break bones."  (Id. at 605-06.)  The trial court limited the testimony to this single

9   statement:

10          THE COURT: Okay.  And with respect to that conversation again,
        that would need to be limited to elicit only the information that would have
11      a tendency to show that the [Petitioner] when he is engaged in any act of
        aggressive physical force is his choice is through the neck.  Anything else
12      outside of that is not relevant, how it occurred or anything of that nature, in
        the sense of the surrounding facts of the conversation, how they go there.
13      That we do not need.

14  (Id. at 603.)

15      Petitioner claims that the trial court erroneously admitted the subject prior act and

16  statement to establish intent, knowledge, and absence of mistake or accident.  (Pet. at 9.)

17  Petitioner relies on Cal. Evid. Code § 1101(a), which "prohibits the admission of evidence

18  of a person's character, including instances of charged and uncharged misconduct, to

19  prove that person's conduct on a particular occasion or to prove he or she has a propensity

20  to commit crime in general."  (Id. at 10.)  However, Petitioner acknowledges that Cal.

21  Evid. Code § 1101(b) allows such evidence to be admitted if it is "relevant to prove some

22  fact other than a disposition to commit that act, such as motive, opportunity, intent,

23  preparation, plan, knowledge, identity, or absence of mistake or accident."  (Id. at 10-11.)

24      Petitioner argues that he was not contesting intent because he "denied the act" and

25  "therefore [was] inferentially admitting that if he did it he had the requisite intent."  (Id. at

26  12.)  Petitioner also argues that his defense was not going to suggest that the incident was

27  an accident or mistake.  (Id.)  According to Petitioner, the issues of intent, knowledge, and

28  absence of mistake or accident were irrelevant, and any evidence admitted to establish

1  those facts should not have been admitted.  (Id. at 12.)

2      Alternatively, Petitioner claims that even if the evidence was admissible under Cal.

3  Evid. Code § 1101(a), it should have been excluded under Cal. Evid. Code § 352, "which

4  mandates the exclusion of evidence the probative value of which is substantially

5  outweighed by its prejudicial impact," because of its "cumulative nature and tendency to

6  confuse issues." (Id. at 11, 16.)  He contends that the wrongful admission of the prior act

7  and statement evidence deprived him of his rights to due process and a fair trial.  (Id. at

8  18.)  He asserts that reversal is necessary because the evidence was prejudicial.  (Id.)

9      Finally, Petitioner claims that his counsel's failure to request a limiting instruction

10  regarding the challenged evidence constituted ineffective assistance of counsel.  (Pet. at

11  18 n. 3.)  However, Petitioner concedes that "limiting instruction as to prior bad acts is

12  waived unless requested by a party" and "there is no sua sponte [sic] duty to instruct on

13  the limited admissability [sic] of prior misconduct", citing People v. Morrison, 92 Cal.

14  App. 3d 787, 790-91 (1979), and People v. Collie, 30 Cal. 3d 43, 63-64 (1981),

15  respectively.  (Id.)

16      The state appellate court rejected this claim and concluded that the trial court did

17  not err in admitting the evidence of Petitioner's prior act and statement.  (Resp't Ex. 6 at

18  25.)  The appellate court applied the three-part test of People v. Thompson, 27 Cal. 3d

19  303, 315 (1980) for evaluating the admissibility of other-act evidence.  (Id. at 16-22 &

20  n.20.)  It concluded that Petitioner's "knowledge of, and physical ability to perform a

21  chokehold that required Bagatelos to concede the match" tended to prove Petitioner's

22  "absence of mistake or accident in the strangulation death of the victim," his intent to kill,

23  and his knowledge that he could inflict pain.  (Id. at 19, 22 & n.20.)  Despite Petitioner's

24  claims, the court found that the absence of mistake or accident in the strangulation was a

25  relevant  issue because Petitioner's trial counsel specifically raised the possibility of

26  accidental strangulation.  (Id. at 19.)  Further, although Petitioner claimed that intent was

27  not an issue because he was not contesting it, the state appellate court determined that

28  Petitioner's "not guilty plea placed all elements of the charged offense of murder at

issue," which includes intent and knowledge.  (<u>Id.</u> at 22.)  Because other-act evidence is admissible under § 1101(b) "to prove some fact (such as... intent,... knowledge,... [and] absence of mistake or accident," the trial court "properly found that the evidence of the consensual wrestling match was relevant and admissible."  (<u>Id.</u> at 13, 18-19, 22.)  The appellate court found that the trial court "did not abuse its discretion by concluding that this probative value was not substantially outweighed by the potential prejudicial effect of the evidence."  (<u>Id.</u>)

With respect to Petitioner's alleged statement that he liked to "go for the neck and break bones" during fights, the appellate court determined that it "was not offered as other-crime or other-act evidence," but rather as "an admission that [Petitioner] employed a certain fight strategy," and that accordingly  "the evidence was not governed by the admissibility limitations of section 1101."  (<u>Id.</u> at 23-24.)  With respect to Petitioner's argument based upon Cal. Evid. Code § 352, the appellate court determined that the statement "was probative as to the question of whether [Petitioner] here chose his customary fight strategy of going for the neck in attacking the victim" because it was "made only six weeks before the charged crime."  (<u>Id.</u>)  Moreover, the appellate court observed that the statement did not have a "significant level of potential prejudicial effect" because the issue was neither time consuming nor did it have a "likelihood of causing jury confusion."  (<u>Id.</u>)  The appellate court found "no error in the court's admission of [Petitioner]'s statement to Bagatelos."  (<u>Id.</u> at 25.)

The Court of Appeal also determined that counsel's failure to request a limiting instruction concerning the subject evidence did not constitute ineffective assistance of counsel because Petitioner did not show prejudice.  (<u>Id.</u> at 27-28.)  There was "no indication from the record that the jury considered the challenged evidence for an improper purpose," and even if there was an error in the admission of the challenged evidence, "any error was harmless because it was not reasonably probable that [Petitioner] would have achieved a more favorable result had the jury not heard the evidence."  (<u>Id.</u>)

Respondent contends that the jury was entitled to draw permissible inferences from

1   the prior act and statement.  See Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th

2   Cir. 1991) (only if there are no permissible inferences that the jury might draw from the

3   evidence can its admission violate due process).  (Resp't at 11.)  For example, the jury

4   could have inferred from Petitioner's consensual wrestling with Bagatelos that Petitioner

5   knew how to employ a chokehold maneuver, that he had the strength to hurt someone and

6   knew it, and that his excessive pressure on Soto's neck was intentional rather than a

7   mistake or accident.  (Id. at 10-11.)  Similarly, the jury could have inferred from

8   Petitioner's statement that he liked to "go for the neck and break bones" that it was more

9   likely for Petitioner to employ such methods on Soto.  (Id. at 11.)

10          The admission of evidence is not subject to federal habeas review unless a specific

11   constitutional guarantee is violated or the error is of such magnitude that the result is a

12   denial of the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan,

13   197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling

14   that admission of irrelevant or overtly prejudicial evidence constitutes a due process

15   violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d

16   1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic

17   materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to,

18   or an unreasonable application of, clearly established Federal law under § 2254(d)).

19   Consequently, there is no established Supreme Court precedent governing whether the

20   admission of irrelevant or prejudicial evidence constitutes a due process violation, and as

21   a result, under 28 U.S.C. § 2254(d)(1), habeas relief is not available based upon a claim of

22   admission of irrelevant evidence.  See Holley, 568 F.3d at 1101.  Petitioner does not

23   argue, nor does the record support, that the state court's determination of facts was

24   objectively unreasonable.  See 28 U.S.C. § 2254(d)(2).

25          Alternatively, even if admission of irrelevant evidence can constitute a violation of

26   due process, Petitioner's claim is still without merit because he fails to show that the trial

27   court's ruling in this cased rendered the trial fundamentally unfair.  See Walters v. Maass,

28   45 F.3d 1355, 1357 (9th Cir. 1995) (the due process inquiry in federal habeas review is

1  whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial

2  fundamentally unfair).  In general, reviewing courts have held that admission of prior bad

3  act testimony does not violate due process where the trial court balanced probative weight

4  against prejudicial effect and gave the jury appropriate cautionary instructions.  Terrovona

5  v. Kincheloe, 912 F.2d 1176, 1180-81 (9th Cir. 1990); Gordon v. Duran, 895 F.2d 610,

6  613 (9th Cir. 1990); Houston v. Roe, 177 F.3d 901, 910 n.6 (9th Cir. 1999).  Here, the

7  record indicates clearly that the trial court balanced probative weight against prejudicial

8  effect in deciding to admit the contested evidence.  See supra at 10-11. Although no

9  limiting jury instructions were given, Petitioner concedes that such instructions were

10  waived because they were not requested by his trial counsel.  (Pet. at 18 n. 3.)

11   Petitioner's argument that any evidence admitted under Cal. Evid. Code § 1101(a)

12  to establish the issues of intent, knowledge, and absence of mistake or accident should

13  have been excluded also is without merit.  The state appellate court concluded that

14  Petitioner's "guilty plea placed all elements of the charged offense of murder at issue,"

15  including intent and knowledge.  (Resp't Ex. 6 at 22.)  In addition, the court determined

16  that the absence of mistake or accident was an issue at trial because Petitioner's counsel

17  specifically raised the possibility of accidental strangulation.  (Id. at 19.)  Other-act

18  evidence is admissible under Cal. Evid. Code § 1101(b) "to prove some fact (such as...

19  intent,... knowledge,... [and] absence of mistake or accident."

20   As to the evidence of Petitioner's prior statement, the state appellate court

21  determined that the statement was not offered as other-act evidence.  Petitioner's

22  argument that the statement should have been excluded under Cal. Evid. Code § 352

23  because of its "cumulative nature and tendency to confuse issues" also is without merit.

24  The trial court found that the probative value of the contested evidence was not

25  substantially outweighed by the potential prejudicial effect of the evidence, see supra at

26  11, and that finding was supported by the record.

27   Finally, Petitioner has not shown that his counsel's failure to request limiting

28  instructions with respect to the contested evidence constituted ineffective assistance.  In

1    order to prevail on this claim, Petitioner must establish that counsel's performance was

2    deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing

3    professional norms, Strickland v. Washington, 466 U.S. 668, 686 (1984), and he must

4    also show that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a

5    reasonable probability that, but for counsel's unprofessional errors, the result of the

6    proceeding would have been different," id. at 694.   A reasonable probability is a

7    probability sufficient to undermine confidence in the outcome.   Id.

8         Generally, trial counsel's decision not to request a limiting instruction with respect

9    to damaging evidence is within the acceptable range of strategic tactics employed to avoid

10   drawing attention to damaging testimony.   See Musladin v. Lamarque, 555 F.3d 830, 845-

11   46 (9th Cir. 2009).   There is a recognized exception in instances where the prosecutor

12   draws the jury's attention to the damaging testimony in closing argument and asks jurors

13   to draw the inference that a limiting instruction would have forbidden.   See id. at 847.

14        Here, the record indicates that the prosecutor did not ask the jurors to draw an

15   inference that a limiting instruction would have forbidden; rather, the prosecutor

16   identified the appropriate grounds for considering Petitioner's wrestling match with and

17   statement to Bagatelos, *i.e.*, as evidence of Petitioner's knowledge, strength, intent, and

18   the absence of mistake or accident.  (RT 1803.)  Moreover, even if counsel should have

19   requested a limiting instruction, the record contains no showing of prejudice.  The state

20   appellate court determined that the prosecution's case depended upon the jury's

21   assessment of Silva's veracity.  (Resp't Ex. 6 at 26-27.)  The contested evidence bore no

22   relationship to that assessment.

23        **2.    Refusal to Allow Jury to View Vehicle**

24        Petitioner contends that the trial court violated his right to present a defense by

25   refusing to allow the jury to view the vehicle in which the murder took place.  (Pet. at 21.)

26   Defense counsel requested such view early in the trial.  (RT 9.)  Counsel wanted the jury

27   to examine the dimensions of the vehicle and to determine if there was any physical

28   evidence that the victim was choked from behind, such as damage to the front interior or

1   dashboard.  (Id.)  The prosecutor argued that the vehicle no longer was in the same

2   condition as it was on the night of the murder, pointing out that: 1) Silva turned the car

3   over to the police three or four days later; 2) the police kept the vehicle for more than a

4   week to examine it and take photographs, after which they released it to a towing yard

5   where it was stored unsecured for a month; 3) the vehicle then was sold to Andrew

6   Nelson, who made changes and repairs; and 4) Nelson sold the car to the defense shortly

7   before trial.  (Id. at 10-11.)

8           The prosecutor argued that under these circumstances, allowing the jury to view

9   the vehicle would be misleading, and that the photographs the police took within days of

10  the crime were the best evidence of the vehicle's condition and appearance on the night of

11  the murder.  (Id. at 11.)  The prosecutor noted that the photographs included pictures of

12  the dashboard and had been turned over to the defense months before trial.  (Id. at 17.)

13  Defense counsel countered that despite the fact that the vehicle had changed hands since

14  Soto's death, there had been no significant alterations.  (Id. at 12.)  Exercising its

15  discretion under Cal. Evid. Code § 352, the trial court ruled that the jury would be

16  allowed to examine the vehicle solely for the "purpose of looking at the interior, the size

17  of the vehicle, and the positioning of the seats," but that argument regarding the

18  "condition the car... if X occurred in the vehicle" would not be allowed.  (Id. at 19.)  The

19  jury did not view the vehicle pursuant to this rule.

20          Toward the end of the trial, the defense counsel renewed his request for a jury view

21  so that the jury could examine the "head rest and the dimensions" of the vehicle.  (Id. at

22  1552.)  The trial court expressed concern that the jury might look at the condition of the

23  dashboard and the front passenger seat, even if it were admonished not do to so, because

24  of the state of the evidence introduced by defense counsel regarding the dashboard and

25  front passenger seat.  (Id. at 1555.)  Accordingly, the court denied the defense's request

26  for a jury view, concluding that "the probative value of size and shape is far outweighed

27  by the prejudicial impact," and that "[t]he prejudicial impact of the jury looking at

28  everything else in the vehicle which is not in the same condition, far outweighs the shape,

1    size and configuration of the vehicle which can be done through the photographs and

2    which can be done through measurements." (Id. 1558-59.)

3         Petitioner argues that allowing the jury to view the vehicle would have posed no

4    logistical or expensive transportation difficulties. (Pet. at 25.)  He also contends that the

5    "badly stated measurements did not afford the jurors enough information about size" and

6    the photos of the car only gave jurors a distorted view of the crime scene. (Id.)  He

7    asserts that "the trial court's conclusion that the car's condition was changed was contrary

8    to the evidence on that subject" because the defense established "there was no evidence of

9    any substantial change in the car's condition between the time it was impounded a mere

10   four days following the killing and the time of trial other than it had been cleaned, and

11   parts not relevant to the crime aspect of the car[] (i.e. the door handles, front axle,

12   electrical system) had been repaired" [sic]. (Id. at 26.)  Petitioner contends that "the trial

13   court's decision was based on the erroneous assumption that unless it could be proven that

14   there was no change at all in the car's condition, the jurors should not see it" because the

15   "exact similarity in the current and past condition of the scene to be viewed is not

16   required." (Id.)  Petitioner claims that without an actual view of the interior of the car, he

17   suffered prejudice and "reversal is therefore required." (Id. at 27.)

18        The state appellate court found that the trial court did not abuse its discretion.

19   (Resp't Ex. 6 at 30.)  It concluded that there were "very real countervailing concerns" to a

20   jury view of the car because the vehicle had changed ownership twice since the victim's

21   death, and thus, "there was no assurance that its condition at the time of trial was the same

22   as it had been one year earlier." (Id. at 31.)  It determined that the trial court had

23   legitimate concerns that the jury might engage in "improper speculation as to the condition

24   of the automobile at the time of the events in question," even with a cautionary instruction.

25   (Id.)  It observed that defense counsel presented multiple photographs of the vehicle, as

26   well as the testimony of an investigator who had taken detailed measurements of the

27   vehicle's interior. (Id.)  It concluded that the defense was able to accomplish its objective

28   of showing the jury the configuration of the vehicle's seats and the dimensions of its

1    interior without an actual viewing of the vehicle.  (Id.)

2        "State and federal rule makers have broad latitude under the Constitution to

3    establish rules excluding evidence from criminal trials."  Holmes v. South Carolina,

4    547 U.S. 319, 324 (2006) (quotations and citations omitted); see also Montana v.

5    Egelhoff, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant

6    the right to present all relevant evidence).  This latitude is limited, however, by a

7    defendant's constitutional rights to due process and to present a defense, rights originating

8    in the Sixth and Fourteenth Amendments.  See Holmes, 547 U.S. at 324. "While the

9    Constitution prohibits the exclusion of defense evidence under rules that serve no

10   legitimate purpose or that are disproportionate to the ends that they are asserted to

11   promote, well-established rules of evidence permit trial judges to exclude evidence if its

12   probative value is outweighed by certain other factors such as unfair prejudice, confusion

13   of the issues, or potential to mislead the jury."  Id. at 325-26; see Egelhoff,

14   518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process

15   Clause unless "it offends some principle of justice so rooted in the traditions and

16   conscience of our people as to be ranked as fundamental.").  The defendant, not the state,

17   bears the burden to demonstrate that the principle violated by the evidentiary rule "is so

18   rooted in the traditions and conscience of our people as to be ranked as fundamental."

19   Egelhoff, 518 U.S. at 47 (internal quotations and citations omitted).

20       Petitioner's claim that the trial court violated his constitutional rights in refusing to

21   allow the jury to view the vehicle in which the murder took place is without merit.  It is

22   well established that the granting or denial of a motion for jury view of premises rests in

23   the discretion of the trial judge and is reviewable only for abuse of that discretion.

24   Hughes v. United States, 377 F.2d 515, 516 (9th Cir. 1967).  The trial court did not abuse

25   its discretion here because there were compelling reasons to exclude such evidence.  The

26   court could not have ensured that the jury would only examine the certain parts of the

27   vehicle, and defense counsel was able to present photographic evidence of the vehicle's

28   measurements and dimensions.  The trial court balanced the prejudicial and probative

value of permitting the jury view the vehicle and reasonably determined a view should not be allowed.

### 3.   Credibility of Prosecution Witness

Petitioner next claims that the prosecution unlawfully withheld impeachment evidence with respect to its key witness, Mike Silva, and that the trial court wrongfully limited the defense's cross-examination of Silva.  The prosecutor elicited the following testimony from Silva on direct examination: 1) from September 2001 to January 2003, Silva served time in prison for possession and transportation of methamphetamine, and thus he was on parole at the time of Soto's murder and during the trial (RT 812-813); 2) before going to prison, Silva used and occasionally sold methamphetamine (id. at 816); 3) Silva was not under arrest when he provided his statement to the police (id. at 818); 4) Silva was in the witness protection program during trial "because of [his] cooperation with the police and [his] fear of the [Petitioner]" (id. at 825); and 5) Silva used methamphetamine days before Soto's murder, traded methamphetamine for marijuana with Bagatelos before the murder, and sold marijuana to a friend after the murder (id. at 755-56, 830-36).

The defense elicited the following testimony on cross-examination: 1) Silva was in the witness protection program because he was "afraid" and feared going back to jail (id. at 838); 2) Silva broke laws while he was in the witness protection program, but his parole was not revoked (id. at 838); 3) Silva had two prior drug-related felony convictions and one prior theft conviction (id. at 839-42); 4) Silva was arrested for inflicting corporal injury on a female cohabitant, but the charge was dropped (id. at 842-43); 5) Silva reported the murder to his parole officer because he was afraid for his safety, his children's safety and of going back to prison (id. at 843); 6) Silva did not get drug tested when he reported Soto's murder to his parole officer (id. at 843, 848); 7) Silva had engaged in drug-related criminal activity both before and after Soto's murder (id. at 843-47); 8) even though he admitted that he was using drugs during his interview with the police, Silva was told that he would not be arrested (id. at 909); and, 9) Silva did not

1  "know of any arrangements between Detective Fry and [his] parole officer concerning

2  [his] parole status" (id. at 909).

3        Defense elicited the following testimony on its cross-examination of Silva's parole

4  officer, Officer Kaestner: 1) Silva would have been on "thin ice" if Officer Kaestner had

5  known he was "using methamphetamine from the week before" (id. at 924); and 2) even

6  though Silva admitted he was using drugs during his interview with the police, Officer

7  Kaestner did not drug test him or institute proceedings to revoke his parole, despite the

8  fact that any illegal conduct would have been a reason to violate Silva's parole (id. at 926-

9  28).

10       Sergeant Fry, the police officer who interviewed Silva about Soto's murder,

11  testified on direct examination that: 1) he did not place Silva in custody during the

12  interview and treated him "as a witness" (id. at 1340); 2) Silva was "cooperative" and

13  "was offering... information voluntarily" (id. at 1341); 3) he did not promise Silva

14  anything in exchange for his cooperation (id.); and 5) he had no agreement with Officer

15  Kaestner about Silva's parole status, nor did he hear Officer Kaestner make an agreement

16  with Silva (id. at 1341).  On cross-examination, Sergeant Fry testified that he "found out

17  [Silva] was a parolee," but "did [not] have him drug tested" (id. at 1362).  He also

18  acknowledged that during his interview with Silva, Silva admitted to using and

19  "swapping" drugs (id. at 1371-74, 1402).

20       Defense counsel attacked Silva's credibility in closing argument by pointing out

21  Silva's prior theft and drug-related convictions, as well as his arrest for inflicting corporal

22  injury (id. at 1827-28).  Counsel also pointed out that Silva first reported the murder to his

23  parole officer rather than to the police, suggesting that Silva hoped his parole officer

24  would insulate him from the police (id. at 1833-34); that Silva "barely lasted maybe half a

25  year before he start[ed] relapsing using drugs" (id. at 1841); and that Silva sold drugs

26  while on parole (id. at 1841-42).

27           a.    **Brady Violation**

28       Petitioner claims that his due process rights were violated because the following

1  impeachment evidence was withheld from the jury: 1) "the fact that Silva's testimony and

2  cooperation was under the umbrella of not being prosecuted under the Three Strikes Law

3  and sentenced to a minimum of 25 years to life, should the prosecution chuse [sic] to

4  prosecute Silva for any of the numerous Penal Code violations that Silva committed

5  before and during trial" (Pet. at 28-29); and 2) Silva's "participation in the witness

6  protection program (and all of his surrounding circumstances) as well as an implied

7  agreement not to prosecute" Silva for his participation in "the murder and disposal of"

8  Soto's corpse.  (Id. at 29, 31, 32.)

9      The state trial court determined that "[t]he jury had sufficient information

10  presented to them to make  their own inferences as to why Mike Silva was testifying and

11  to weigh his credibility." In re Armendariz, No. HC5870, slip op. at 2 (Super. Ct. Cal.

12  Dec. 20, 2007) (Resp't Ex. 10, Ex. A attached thereto at 2).  The record shows that "the

13  jury was presented with evidence of [Silva's] involvement in the murder of Ernie Soto,"

14  and they "heard testimony regarding his prior convictions, that he had been to prison, that

15  he was on parole at the time of the murder, that he was not arrested and/or his parole was

16  not violated due to this offense and/or any other offenses." Id.  The jury also was told that

17  Silva "was in the witness protection program, not only because of his fear of defendant

18  but because of his cooperation with the police." Id.  Silva admitted that "one of the

19  reasons he was in the program was because he was afraid of going back to jail" and that

20  "he was doing what was necessary to stay in the witness protection program and was still

21  in the program in spite of his new offenses." Id. Furthermore, "[a]ssuming arguendo...

22  [that] the jury was somehow prohibited from hearing that Mike Silva was in the witness

23  protection program in exchange for his testimony[,] '[a] new trial is generally not required

24  when the testimony of the witness is "corroborated by other testimony."'" Id. at 2-3

25  (quoting United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995)).  Here, Silva's

26  testimony was "corroborated by other testimony, including but not limited to, the

27  testimony of Gregory Watkins and his statements to the police, and Petitioner's own

28  inconsistent admissions." Id. at 3.

1    In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the

2  suppression by the prosecution of evidence favorable to an accused upon request violates

3  due process where the evidence is material either to guilt or to punishment, irrespective of

4  the good faith or bad faith of the prosecution." Id. at 87.  "There are three components of

5  a true Brady violation: [t]he evidence at issue must be favorable to the accused, either

6  because it is exculpatory, or because it is impeaching; that evidence must have been

7  suppressed by the State, either willfully or inadvertently; and prejudice must have

8  ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "[T]here is never a real

9  'Brady violation' unless the nondisclosure was so serious that there is a reasonable

10  probability that the suppressed evidence would have produced a different verdict." Id. at

11  281.

12    "Brady information includes 'material... that bears on the credibility of a

13  significant witness in the case.'" United States v. Brumel-Alvarez, 991 F.2d 1452, 1461

14  (9th Cir. 1993) (quoting United States v. Strifler, 851 F.2d 1197, 1201 (9th Cir. 1988).

15  "Evidence relevant to the impeachment of a witness adverse to the defendant may be

16  favorable and material when the reliability of the witness may be determinative of the

17  defendant's guilt or innocence." United States v. Collins, 551 F.3d 914, 924 (9th Cir.

18  2009) (internal quotations and citation omitted).  "'Impeachment evidence is especially

19  likely to be material when it impugns the testimony of a witness who is critical to the

20  prosecution's case.'" United States v. Price, 566 F.3d 900, 913-14 (9th Cir. 2009)

21  (quoting Silva v. Brown, 416 F.3d 980, 987 (9th Cir. 2005)) (finding Brady violation for

22  the prosecution's failure to disclose evidence of a key witness' criminal history of

23  dishonest and fraudulent conduct).

24    The fact that the defense already has some evidence with which to impeach a

25  prosecution witness does not excuse the prosecution from disclosing further impeachment

26  evidence which "'would provide the defense with a new and different ground of

27  impeachment.'" Silva, 416 F.3d at 989-90 (citation omitted) (habeas granted based on

28  failure to disclose provision in deal between prosecution and witness excusing witness

1  from psychiatric exam which would have exposed witness's incompetence).  However,

2  where the undisclosed impeachment evidence would have provided no independent basis

3  for impeaching the witness separate from evidence already known to and utilized by the

4  defense, no <u>Brady</u> violation will be found.  <u>United States v. Kohring</u>, 637 F.3d 895, 908

5  (9th Cir. 2011).

6         Respondent contends there is no evidentiary basis for Petitioner's claim that the

7  prosecution procured Silva's cooperation and testimony by agreeing not to prosecute him

8  for any crimes.  (Resp't at 17.)  Respondent argues that even if he could prove that such

9  evidence existed and was withheld, Petitioner cannot show that the evidence was material.

10  <u>Id.</u> at 17-18.  Viewed as a whole, the testimonies of Silva, Officer Kaestner and Sergeant

11  Fry show that:

12        Silva cooperated with the police because he did not want to go back to jail;
          that he was never arrested in connection with Soto's murder; that even
13        though he had engaged in criminal activity while in the witness protection
          program, he did not have his parole violated; that even though he admitted
14        using drugs during his interview with police, he was told he would not be
          arrested, he was not drug tested, and his parole was not revoked; and that
15        even though he had engaged in criminal activity both before and after
          Soto's murder, he was still on parole at the time of trial.

16

17  <u>Id.</u> at 18.  Respondent contends that under these circumstances, "any evidence of an

18  actual agreement between Silva and the police would have been merely cumulative to

19  such impeachment evidence, and therefore immaterial," and that  "the suppression of such

20  evidence could not have had a substantial or injurious effect on the jury's verdict."  <u>Id.</u>

21  (citing <u>Fry v. Pliler</u>, 551 U.S. 112, 121-122 (2007)).

22        Petitioner's claim is not supported by the record.  As Respondent argues, there is

23  no evidence of a non-prosecution agreement, and Silva's participation in the witness

24  protection program was in fact revealed to the jury.  Even if Petitioner could overcome

25  this hurdle, the evidence would not have provided an "independent basis for impeaching

26  the witness separate from evidence already known to and utilized by the defense."

27  <u>Kohring</u>, 637 F.3d at 908.  As Respondent argues, the testimony of Silva, Officer

28  Kaestner, and Sergeant Fry revealed that Silva cooperated with the police voluntarily

1  because of his fear of going back to jail; that he was never under arrest in connection with

2  Soto's murder; that his parole was not violated even though he committed criminal acts;

3  and that he was not drug tested when he admitted to the police during his interview that

4  he used drugs.  Evidence of an agreement between Silva and the police and further

5  evidence of Silva's participation in the witness protection program would not have

6  provided "an independent basis" for impeaching Silva because there was already ample

7  evidence concerning those issues.  Id.

8              **b.     Confrontation Clause**

9          Petitioner next contends that the trial court erred when "the defense was prohibited

10  from inquiring as to any testimony in regards to Silva's participation in the witness

11  protection program, deals, promises [and] concessions," thereby violating his rights under

12  the Confrontation Clause.  (Id. at 35.)  The Confrontation Clause of the Sixth Amendment

13  provides that in criminal cases the accused has the right to "be confronted with witnesses

14  against him."  U.S. Const. amend. VI.  The federal confrontation right applies to the states

15  through the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400, 403 (1965).  The

16  ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a

17  procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61

18  (2004).  It commands not that evidence be reliable but that reliability be assessed in a

19  particular manner: by testing in the crucible of cross-examination.  Id.; see Davis v.

20  Alaska, 415 U.S. 308, 315-16 (1974) (a primary interest secured by the Confrontation

21  Clause is the right of cross-examination).

22          However, the Confrontation Clause does not prevent a trial judge from imposing

23  reasonable limits on cross-examination based on concerns of harassment, prejudice,

24  confusion of issues, witness safety or interrogation that is repetitive or only marginally

25  relevant.  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  The Confrontation Clause

26  guarantees an opportunity for effective cross-examination, not cross-examination that is

27  effective in whatever way, and to whatever extent, the defense might wish.  See Delaware

28  v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  A defendant meets his burden of

showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility... had counsel been permitted to pursue his proposed line of cross-examination." Van Arsdall, 475 U.S. at 680.

Petitioner points to an excerpt of the trial transcript that "concerns the trial court's refusal to allow the defense to question Silva about his arrest for possession of a weapon while in the witness protection program." (Id. at 19 (citing RT 887-889).) Although the court determined that the arrest was inadmissible as impeachment evidence "because it was not a crime of moral turpitude" (RT 887-889), the defense obtained an admission from Silva "that he had committed a criminal act while in the witness protection program, but did not have his parole revoked" (RT 838). Id. Respondent argues that because a trial court may limit the scope of cross-examination by applying traditional rules of evidence, see, e.g., Van Arsdall, 475 U.S. at 679, "[t]he court's restriction on defense's cross-examination of Silva on the specifics of his criminal act was not... a violation of [P]etitioner's rights." Id.

Respondent also argues that even if the trial court erred by limiting the cross-examination of Silva, "such a restriction did not rise to a constitutional violation because the line of inquiry would not have produced a significantly different impression of Silva's credibility." (Id. (citing Van Arsdall, 475 U.S. at 680 (a trial court's exclusion of evidence does not violate a defendant's constitutional rights unless the prohibited cross-examination might reasonably have produced a significantly different impression of the witness's credibility)).) Id. The jury was aware that "Silva was present during Soto's murder and the disposal of his body, and had committed crimes both before and after Soto's murder for which he could have been prosecuted, but was not." Id. Accordingly, "the suppression of such evidence could not have had a substantial or injurious effect on the jury's verdict." Id. (citing Fry, 551 U.S. at 121-122).

This Court agrees. The record shows that defense counsel in fact did question Silva about both the witness protection program and his cooperation with the police. See

1    *supra* at 20-21.  The excerpt of the transcript upon which Petitioner relies shows only that

2    the court refused to allow the defense to question Silva about an arrest for possession of a

3    weapon while in the witness protection program because it was not a crime of moral

4    turpitude.  (RT 887-889.)  Because a trial judge may impose "reasonable limits on cross-

5    examination based on concerns of harassment, prejudice, confusion of issues, witness

6    safety or interrogation that is repetitive or only marginally relevant," the court's

7    restriction of defense's cross-examination was not a violation of Petitioner's rights.  See

8    Van Arsdall, 475 U.S. at 679.  Moreover, Petitioner has not shown that a reasonable jury

9    would have received a significantly different impression of Silva's credibility had counsel

10   been permitted to pursue this additional line of cross-examination.  Id. at 680.

11                    **4.      Cross-Examination of Watkins**

12          Petitioner claims that "the trial Court [sic] acted erroneously when it licensed the

13   prosecution to unlimited, boundless, direct examination of the witness Watkins," which

14   he claims resulted in a violation of his right to effective cross-examination.  (Pet. at 41-

15   42.)  Petitioner also claims that the prosecutor's second reference to Watkin's conviction

16   as an accessory to Soto's murder was prejudicial and violated his right to due process.

17   (Id. at 43-44.)  Petitioner argues that the trial court should have given a limiting

18   instruction with respect to the accessory conviction.  (Id. at 44-45.)

19          Watkins testified that he had been friends with Petitioner for three years and that

20   he did not want to testify against him.  (RT 933-34.)  Watkins also testified that he, Silva

21   and Soto had helped Petitioner move (id. at 35-39), that afterwards he was dropped off at

22   his house and everybody else left  (id. at 42-43), and that he drank several beers and went

23   to bed.  (Id. at 43-44.)  Watkins testified that he did not recall seeing Petitioner, Silva, or

24   Soto again that night.  (Id. at 944.)  He also stated that he did not assist in the disposal of

25   Soto's body.  (Id. at 952.)  However, he admitted that he was convicted as an accessory to

26   Soto's murder based on the fact that he helped dispose of the body.  (Id. at 954.)

27          Watkins testified that he was arrested a few days later after the murder, but that all

28   he could remember at that time was waking up in the holding cell, being removed from

1   the cell by Sergeant Fry, and then being moved to the county jail.  (Id. at 944-45.)  He

2   claimed he could not remember having been interviewed by Sergeant Fry.  (Id. at 946.)

3   The prosecution continued to ask questions about an interview with Sergeant Fry until

4   defense counsel objected, contending that Watkins already had testified that he had no

5   memory of the interview and only remembered waking up in a holding cell.  (Id. at 945.)

6   The trial court overruled the objection, reasoning that the prosecutor was entitled to lay a

7   foundation because "she is required to ask those questions in order to be able to ask later

8   witnesses of that."  (Id. at 947.)  The trial court acknowledged defense counsel's

9   continuing objection to the prosecution's line of questioning.  (Id. at 948.)  The prosecutor

10  then continued to question Watkins about the interview.  (Id. at 949-56.)

11      At the end of the day, the trial court allowed defense counsel to explain his

12  continuing objection on the record.  (Id. at 959.)  Counsel stated that he understood that

13  the prosecutor planned to call Sergeant Fry to testify about the statements Watkins

14  claimed he could not remember, but that because of Watkins' lack of recollection, the

15  defense would not have an opportunity to cross-examine Watkins about those statements.

16  (Id.)  The prosecutor argued Watkins' statements to Sergeant Fry were admissible as

17  "prior inconsistent statements."  (Id. at 960.)  The trial court agreed:

18          As I indicated at sidebar that [the prosecutor] would be required
        before she impeached somebody or brought statements in that person said,
19      she has to confront them with the statements and give them an opportunity
        either to admit or deny or say they don't remember. It appears that's what
20      she is doing is laying a foundation as to whether he remembers, does not
        remember, admits or denies.
21          And the court will take a ruling at a later date whether that actual
        statements are admissible as to whether that foundation has been made by
22      confronting the witness with the statement. Your right to confrontation is of
        the witness on the stand. Whatever comes out of his mouth is whatever
23      comes out of his mouth. But the right to confrontation means that the
        witness is on the stand.
24

25  (Id. at 960.)

26      Defense counsel also raised an objection based upon Crawford v. Washington, 541

27  U.S. 36 (2004), arguing that "testimonial information is going to be coming in by the back

28  door through testimony [Watkins] doesn't recall, and we have no ability to examination

1   [sic] those statements as to what he said." (Id. at 961.)  The trial court rejected this

2   argument as well:

3           Crawford applies to the inability to examination [sic] the declarant.
        The declarant is on the stand. That's what Crawford relates to. His
4       statements that are then made out of court and the witness is not available
        for cross-examination at trial.  This witness is available for cross-
5       examination at trial. Whether he cooperates or not, that's on him. But he is
        here.

6
    (Id. at 961.)
7

8           On cross-examination, Watkins repeated his testimony that "he did not recall

9   talking to [the officers]."  (Id. at 1022-27.)

10          The state trial court rejected Petitioner's claim:

11          Gregory Watkins testified at the trial and admitted that he did not
        want to testify against his friend.  (RT page 934, lines 19-21.) The District
12      Attorney properly laid the foundation for the introduction of his prior
        inconsistent statements by confronting him with such statements pursuant to
13      Evidence Code § 770. The witness was not "unavailable" as defined by
        Crawford v. Washington (2004) 541 U.S. 36.
14
    (Resp't Ex. 10, Ex. A attached thereto at 3).
15

16          Petitioner's claim that the trial court violated his right to cross-examination by

17  allowing the prosecutor to continue to ask Watkins questions about an interview he

18  claimed he could not remember is without merit.  The right to confrontation includes the

19  right to cross-examine adverse witnesses and to present relevant evidence**.** Wood v.

20  Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992).  However, "[t]he Confrontation Clause...

21  guarantees only an opportunity for effective cross-examination, not successful

22  cross-examination, [and] is satisfied where... the defendant has a full and fair opportunity

23  to bring out the witness' bad memory and other facts tending to discredit his testimony.**"**

24  United States v. Owens, 484 U.S. 554, 559-560 (1988).  Here, defense counsel had a "full

25  and fair opportunity" to cross-examine Watkins.  See id.  Although there was evidence

26  that Watkins was feigning memory loss, he still was subjected to unrestricted cross-

27  examination about his statements to the police.  "The weapons available to impugn the

28  witness' statement when memory loss is asserted will of course not always achieve

1   success, but successful cross-examination is not the constitutional guarantee." Id. at 560.

2       Petitioner's claim with respect to the prosecutor's second reference to Watkins'

3   conviction as an accessory to Soto's murder also is without merit.  The admission of

4   evidence is not subject to federal habeas review unless a specific constitutional guarantee

5   is violated or the error is of such magnitude that the result is a denial of the fundamentally

6   fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir.

7   1999).  Petitioner does not fault the prosecutor for bringing up the fact of Watkins'

8   conviction as an accessory to Soto's murder the first time; his claim involves only the

9   prosecutor's second reference.  As Respondent contends, the second reference was highly

10  unlikely to be prejudicial because the jury already knew about Watkins' conviction.  It

11  certainly did not result in "a denial of the fundamentally fair trial guaranteed by due

12  process."

13      A state trial court's refusal to give an instruction does not alone raise a ground

14  cognizable in a federal habeas corpus proceedings.  See Dunckhurst v. Deeds, 859 F.2d

15  110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was

16  deprived of the fair trial guaranteed by the Fourteenth Amendment.  See id.  The

17  prosecution's case hinged on the credibility and testimony of Silva, not that of Watkins.

18  Thus, a limiting instruction to the jury regarding how to use the evidence of Watkins'

19  conviction as an accessory would have had little effect on the trial.  Petitioner has not

20  shown that he was "deprived of the fair trial guaranteed by the Fourteenth Amendment,"

21  nor has cited a Supreme Court case that establishes a right to a limiting instruction under

22  such circumstances.  See id.

23      **5.      Use of Prior Conviction to Enhance Sentence**

24      Petitioner claims that the trial court improperly used a prior conviction to enhance

25  his sentence.  (Pet. at 46.)  In 1992, Petitioner pled nolo-contendere to felony assault with

26  a firearm (Cal. Pen. Code § 245) in exchange for dismissal of the remaining counts

27  against him.  (Id.)  He was sentenced on April 2, 1992, to three years' probation.  (Id.)

28  The plea agreement stipulated that if he fulfilled the conditions of probation for the entire

1    period of probation and was not then charged with, serving a sentence for, or on probation

2    for another offense, he would be permitted to withdraw his plea, have the accusations

3    against him dismissed, and thereafter be released from all penalties and disabilities

4    resulting from the offense.  (Resp't Ex. 10, Ex. B attached thereto.)  The charge in fact

5    was dismissed three years later pursuant to Cal. Pen. Code § 1203.4.  (Resp't Ex. 1,

6    Clerk's Transcript ("CT") at 294.)

7         Petitioner claims that the state breached the 1992 plea agreement, citing Santobello

8    v. New York, 404 U.S. 257, 261-262 (1971), assault with a firearm conviction, to qualify

9    him as a "three strikes" in this case.  He argues that the plea agreement provided that he

10   would be released from "all penalties and disabilities," and that the 1992 conviction

11   should be treated as being "expunged" or as a "complete and total pardon."  (Pet. at 46-

12   47.)  Petitioner also contends that he was "denied any real notice of the true nature of the

13   consequences of the plea" because there was no "Three Strikes Law" at the time of the

14   plea agreement. (Id. at 47-48.)

15        The amended information in this case alleged that the 1992 conviction qualified as

16   both a prior "strike" conviction and a prior serious felony conviction.  (CT 190-91.)  In a

17   bifurcated bench trial on the prior conviction allegations, the state trial court found that

18   the 1992 conviction qualified in both respects.  (RT at 2259-60.)  At sentencing, the court

19   used the 1992 conviction, along with a 1997 prior conviction, see infra at 32-34, to triple

20   Petitioner's sentence pursuant to California's "Three Strikes Law."  (Id. at 2533.)

21        The state trial court rejected this claim and determined that Petitioner's sentence

22   was properly enhanced with his 1992 conviction because the conviction was a qualifying

23   felony as defined in Cal. Pen. Code § 1170.12(b), which provides as follows:

24            The determination of whether a prior conviction is a prior felony conviction
             for purposes of this section shall be made upon the date of that prior
25            conviction and is not affected by the sentence imposed unless the sentence
             automatically, upon the initial sentencing, converts the felony to a
26            misdemeanor. None of the following dispositions shall affect the
             determination that a prior conviction is a prior felony for purposes of this
27            section: (A) the suspension of imposition of judgment or sentence....

28   (See Resp't Ex. 10, Ex. A attached thereto at 3.)  Relying upon People v. Queen, 141 Cal.

1    App. 4th 838 (2006) and <u>People v. Diaz</u>, 41 Cal. App. 4th 1424 (1996), the court noted

2    that "a conviction of a qualifying felony remains a strike even if it is later dismissed or

3    reduced, unless a misdemeanor sentence was imposed at the initial sentencing." (<u>Id.</u> at 4.)

4         Respondent points out that under Cal. Pen. Code § 1203.4: "'in any subsequent

5    prosecution of the defendant for any other offense, the prior conviction may be pleaded

6    and proved and shall have the same effect as if probation had not been granted.'" (Resp't

7    at 24, quoting Cal. Pen. Code § 1203.4.)  Respondent also observes that there "is no

8    evidence in the record that the parties made any agreement regarding the use of the 1992

9    conviction in subsequent prosecutions." (<u>Id.</u> at 25.)

10        Petitioner's claim is without merit.  California courts consistently have applied

11   this section of the statute to uphold enhanced sentences in similar cases.  See <u>Adams v.</u>

12   <u>County of Sacramento</u>, 235 Cal.App.3d 872 (1991); <u>People v. Walters</u>, 190 Cal.App.2d

13   98, 102 (1961).  Petitioner's belief that his conviction was "expunged" or that the

14   dismissal under § 1203.4 amounted to a "total pardon" is erroneous as a matter of law.

15        Petitioner's alternative argument that the state breached the plea agreement

16   because he was denied "true notice" of the consequences of the plea – there being no

17   "Three Strikes Law" when he made his plea agreement – also is without merit.  As

18   Petitioner states acknowledges, he could not have been informed about the "Three Strikes

19   Law" in 1992 because it was enacted in 1994, two years after his plea agreement.  In any

20   event, there is no violation of due process where a trial court fails to inform a defendant of

21   the collateral consequences of a guilty plea.   See <u>United States v. Garrett</u>, 680 F.2d 64,

22   65-66 (9th Cir. 1982); <u>Torrey v. Estelle</u>, 842 F.2d 234, 236 (9th Cir. 1988).

23        **6.    <u>Ex Post Facto</u>**

24        Petitioner claims that the use as a "strike" of his 1997 prior conviction for making

25   criminal threats, which resulted in the tripling of his base sentence, violated the

26   constitutional prohibition against "ex post facto law[s]" because making criminal threats

27   was not a "strike" offense in 1997. (Pet. at 52.)  Indeed, the offense of making criminal

28   threats only became a "serious felony" in 2000, after the passage of Proposition 21, which

1   added a number of offenses to the list of strikable, or serious, felonies under Penal Code §

2   1192.7.  Petitioner claims that because making criminal threats was not a serious felony at

3   the time of his conviction for that offense, the conviction should not have been used to

4   increase his sentence in this case.  (Id.)  The amended information alleged that

5   Petitioner's 1997 felony conviction for making criminal threats qualified both as a prior

6   strike conviction and a prior serious felony conviction.  (CT 190.)  The state trial court

7   found that the 1997 conviction qualified as both a prior serious felony conviction and a

8   prior strike conviction.  (RT 2260.)

9          The state trial court determined that "a prior conviction of a felony violation of

10  Penal Code § 422, though not listed as a strike on April 23, 1999, can be used as a strike

11  by virtue of the addition of that charge to the list in Proposition 21 on March 8, 2000 (PC

12  1192.7(c)(38))," citing People v. Moore, 118 Cal. App. 4th 74 (2004).  (Resp't Ex. 10,

13  Ex. A thereto at 4.)  In People v. James, 91 Cal. App. 4th 1147, 1150 (2001), the court

14  concluded "the application of Proposition 21 to felonies committed before the effective

15  date of Proposition 21 would not violate the prohibition against ex post facto laws, as long

16  as the current felony offenses were committed on or after the effective date of Proposition

17  21."  (Resp't at 26-27.)  The Supreme Court consistently has upheld recidivism statutes

18  "against contentions that they violate constitutional strictures dealing with double

19  jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection,

20  and privileges and immunities."  See, e.g., Parke v. Raley, 506 U.S. 20, 27 (1992).

21         The Ex Post Facto clause prohibits the enactment of laws that retroactively would:

22  (1) make an act done before the passing of the law, which was innocent when done,

23  criminal; (2) aggravate a crime or makes it greater than it was when committed; (3)

24  changes the punishment and inflicts a greater punishment for the crime than the

25  punishment authorized by law when the crime was committed; or (4) alters the legal rules

26  of evidence and requires less or different testimony to convict the defendant than was

27  required at the time the crime was committed.  See Stogner v. California, 539 U.S. 607,

28  611-12 (2003) (citing Calder v. Bull, 3 Dall. 386, 390-91 (1798); Carmel v. Texas, 529

1   U.S. 513, 519-38 (2000) (discussing Collins v. Youngblood, 497 U.S. 37 (1990), Beazell
2   v. Ohio, 269 U.S. 167, 169-70 (1925) and Calder v. Bull, 3 Dall. 386 (1798)).

3          Here, tripling Petitioner's base sentence was not an increased punishment for the
4   prior conviction but rather an enhancement of the sentence for his current offense. See id.
5   The enhancement is "attributable to [Petitioner's] status as a repeat offender and arise[s]
6   as an incident of the present offense, rather than constituting a penalty for the prior
7   offense." See People v. Jackson, 37 Cal. 3d 826, 833 (1985) (quoting In Re Foss, 10
8   Cal.3d 910, 922 (1974)). Petitioner was convicted of first degree murder on September
9   10, 2004, well after the amendments to § 1192.7 became law in 2000. Because
10  Petitioner's present conviction occurred after the enactment of the statute, prior
11  convictions occurring before the enactment of the statute properly could be used to
12  enhance his sentence. See Fong v. United States, 287 F.2d 525, 526 (9th Cir. 1961), cert.
13  denied, 366 U.S. 971 (1961); Williams, 140 Cal. App. 3d at 448-49. Application of an
14  enhancement resulting from a prior conviction is not a violation of the ex post facto clause
15  of the Constitution. See McDonald v. Massachusetts, 180 U.S. 311, 312-13 (1901);
16  United States v. Sorenson, 914 F.2d 173, 174 (9th Cir. 1990) (dismissing ex post facto
17  challenge as meritless), cert. denied, 498 U.S. 1099 (1991).

18              **7.    Ineffective Assistance of Trial Counsel**

19         Petitioner claims that his trial counsel was ineffective for failing to object to the
20  trial court's use of his 1992 and 1997 prior convictions as strikes. (Pet. at 52.) However,
21  although defense counsel did not object to the 1992 conviction, he did object to the use of
22  the 1997 conviction as a strike. (RT 2259.) On habeas, the state trial court found that
23  Petitioner had failed to "establish any prejudice suffered as a result of his attorney's
24  alleged errors during trial or sentencing, or that his attorney performed his duties below
25  an objective standard of reasonableness." (Resp't Ex. 10, Ex A thereto at 4.)

26         To prevail on an ineffective assistance of counsel claim, Petitioner must establish
27  two elements under Strickland, 466 U.S. at 668: 1) that counsel's performance was
28  deficient, meaning, that it fell below an "objective standard of reasonableness" under

1  prevailing professional norms, id. at 687-688; and 2) that he was prejudiced by counsel's

2  deficient performance, id. at 694.  See supra at 16.  A court need not determine whether

3  counsel's performance was deficient if the lack of prejudice is clear.  Id. at 697.  On

4  federal habeas, a petitioner must show that the state court applied Strickland to the facts

5  of his case in an objectively unreasonable manner.  Yarborough v. Gentry, 540 U.S. 1, 5

6  (2003) (per curiam).

7       Since the record shows that counsel did object to the trial court's use of the 1997

8  conviction as a strike, the only question is whether counsel's failure to object to the use of

9  the 1992 conviction as a strike constituted ineffective assistance of counsel.  As discussed

10  above, the use of the 1992 conviction as a strike was not error.  See supra at 32.

11  Accordingly, counsel's failure to make a meritless objection would not have constituted

12  ineffective assistance.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (failure

13  to file a meritless motion is not ineffective).

14       **8.    Ineffective Assistance of Appellate Counsel**

15       Finally, Petitioner claims that his appellate counsel was ineffective for failing to

16  raise on appeal several issues he raises here, namely "issues three, four, five, six, seven,

17  and eight."  (Pet. at 55.)

18       Claims of ineffective assistance of appellate counsel are reviewed according to the

19  standard set out in Strickland, 466 U.S. 668.  Smith v. Robbins, 528 U.S. 259, 285 (2000).

20  First, the petitioner must show that counsel's performance was objectively unreasonable,

21  which in the appellate context requires the petitioner to demonstrate that counsel acted

22  unreasonably in failing to discover and brief a merit-worthy issue.  Smith, 528 U.S. at

23  285.  Second, the petitioner must show prejudice, which in this context means that the

24  petitioner must demonstrate a reasonable probability that, but for appellate counsel's

25  failure to raise the issue, the petitioner would have prevailed in his appeal.  Smith, 528

26  U.S. at 285-86.  Appellate counsel does not have a constitutional duty to raise every

27  nonfrivolous issue requested by defendant.  See  Miller v. Keeney, 882 F.2d 1428, 1434

28  n.10 (9th Cir. 1989).  The weeding out of weaker issues is widely recognized as one of the

1  hallmarks of effective appellate advocacy.  See id. at 1434.  Appellate counsel therefore

2  will frequently remain above an objective standard of competence and have caused his

3  client no prejudice because he declined to raise a weak issue.  Id.

4        As discussed above, each of Petitioner's claims lack merit.  See supra at 10-34.

5  Appellate counsel's decision not to raise these issues on appeal did not constitute

6  ineffective performance because "the failure to raise untenable claims on appeal does not

7  constitute ineffectiveness."  Turner v. Calderon, 281 F.3d 851, 872 (9th Cir. 2002).

8  Accordingly, the state court properly rejected this claim.  See 28 U.S.C. § 2254(d)(1).

9

10                                        **CONCLUSION**

11        The Court concludes that Petitioner has not shown any violation of his federal

12  constitutional rights in the underlying state criminal proceedings.  Accordingly, the

13  petition for a writ of habeas corpus is denied.

14                            **CERTIFICATE OF APPEALABILITY**

15        The federal rules governing habeas cases brought by state prisoners have been

16  amended to require a district court that denies a habeas petition to grant or deny a

17  certificate of appealability ("COA") in its ruling.  See Rule 11(a), Rules Governing §

18  2254 Cases, 28 U.S.C. foll. § 2254.  For the reasons set out in the discussion above,

19  petitioner has not shown "that jurists of reason would find it debatable whether the

20  petition states a valid claim of the denial of a constitutional right [or] that jurists of reason

21  would find it debatable whether the district court was correct in its procedural ruling."

22  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Accordingly, a COA is DENIED.

23        The Clerk shall enter judgment and close the file.

24        IT IS SO ORDERED.

25  DATED:  _8/22/11_____        _____

26                                        JEREMY FOGEL
                                          United States District Judge

27

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ROBERT T. ARMENDARIZ,

            Petitioner,

   v.

MIKE KNOWLES, Warden,

            Respondent.

_____/

Case Number: CV07-00264 JF

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on _____8/31/11_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Robert Tino Armendariz C-60637
Kern State Prison
P.O. Box 5103
 C-6-132U
Delano, CA 93216

Dated: ____8/31/11_____

                    Richard W. Wieking, Clerk